DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Huron County Juvenile Court, which granted permanent custody of Ashley D. to the Huron County Department of Jobs and Family Services. For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} Ashley D. was born on March 8, 1999 to appellant Beth D. and David S.[1] The Huron County Department of Jobs and Family Services ("the agency") became involved with appellant in early 1998 after receiving a complaint that appellant was suffering from post-partum depression following the birth of her son, James. James was eventually placed in foster care, was returned to his mother for a time, and was again placed in foster care.[2]
 {¶ 3} Ashley lived with her mother until approximately May 2000, when Ashley was just over a year old. At that time, appellant had contacted an agency social worker and told her that she (appellant) could not take care of her children and wanted to surrender them. Ashley was then placed in foster care, and she has not returned to live with her mother since.
 {¶ 4} In August 2000, the agency filed a complaint alleging that Ashley appeared to be a dependent child. At a hearing in September 2000, the trial court adjudicated Ashley a dependent child after her mother entered an admission to the complaint. The agency was awarded temporary custody of Ashley.[3] Initially, the case plan called for Ashley to be reunified with her parents, and the following goals were set in the case plan for
 {¶ 5} appellant: stop lying; maintain a stable home; maintain sufficient financial resources to support herself and her children; and learn effective child-rearing techniques. Appellant was to attend counseling to help her deal more appropriately with others and to help her to stop lying, and she was to attend parenting classes to teach her to be a more effective parent.
 {¶ 6} On January 31, 2002, having not seen appellant make significant progress toward the goal of reunifying with Ashley, the agency moved for permanent custody. A hearing on the motion for permanent custody was held in March 2002. Two of appellant's social workers testified at the hearing on the motion for permanent custody — Barb Fries, who worked on the case until October 2000, and Julie Harris, who worked on the case thereafter.
 {¶ 7} Barb Fries testified that appellant made only a half-hearted attempt to comply with the case plan. Fries testified that appellant was not responsible about arranging transportation or about scheduling or keeping counseling appointments. On cross-examination, Fries testified that appellant completed her parenting classes and that she attended some, but not all, of her counseling sessions. According to Fries, however, she did not think that appellant "got a whole lot out of" counseling — that appellant went to counseling only because she had to and not because she wanted to. Fries also testified that appellant had trouble complying with the case plan goal of keeping medical appointments for her children. In fact, according to Fries, one doctor refused to see appellant or her family because appellant had missed so many appointments. When asked whether appellant had trouble keeping appointments because she did not have reliable access to transportation, Fries testified that she thought mostly that appellant did not plan ahead. Fries admitted, however, that some of appellant's problems with appointments may have stemmed from not having reliable transportation.
 {¶ 8} Fries also testified that appellant had difficulty complying with the case plan goal of being truthful and of maintaining a stable home. Fries explained that appellant had moved two or three times in the couple of years that she was involved with the family, that appellant was evicted at least once, and that appellant was "always going to move." Finally, Fries testified that, although she believed that appellant genuinely loved her children, appellant did not know how to take care of them; Fries testified (over objection) that appellant was not ready to be reunified with the children.
 {¶ 9} Julie Harris, the second social worker who worked with appellant, also testified that appellant has not been consistent in using the agency resources available to her to help her meet her case plan goals. For example, appellant would wait until the last minute to request help with transportation, making it difficult for the agency to arrange that for her. In terms of working toward the goal of having stable housing, Harris testified that appellant had maintained stable housing in the five months leading up to the permanent custody hearing; however, before that time, appellant had moved three or four times, had been in and out of jail several times, and had not always been in contact with the agency to report her whereabouts.
 {¶ 10} In terms of the case plan goal of having sufficient financial resources to care for her children, Harris testified that appellant has not worked the entire time that she had been involved with appellant's case. On cross-examination, Harris recognized that at some point during the pendency of the case appellant began receiving social security disability benefits; however, Harris also believed that appellant would be allowed to work limited hours and still retain her benefits. Harris also admitted that appellant had once tried to get a job at a restaurant but that she was prevented from working there when she was sent to jail.
 {¶ 11} In terms of assessing appellant's housing situation, Harris testified that she had visited appellant's most recent home on three or four occasions and saw food in the refrigerator, but she testified that appellant did not have the furniture or bedding she would need to have her children come to live with her. However, she also testified that appellant told her that she (appellant) could acquire such furniture and bedding if needed. Finally, Harris testified that she knows that appellant wants her children back and she agreed that appellant is making "some progress." However, on redirect examination Harris testified that appellant is not doing her best to seek employment or to provide financially for her children.
 {¶ 12} Next, Robin Hunt, an employee with the Huron County Child Support Enforcement Agency, testified. She testified that appellant had been ordered to pay child support for Ashley and that appellant never made a payment. Hunt also noted that appellant had requested a review of her child support order but that the review was not completed because appellant had not complied with the review process.
 {¶ 13} Kathy Baughman, an employee of Miriam House, also testified. Miriam House is a transitional housing program run by Catholic Charities that serves the needs of homeless women and their children. Appellant was a resident at Miriam House (without her children) for approximately four months from late 2000 to early 2001. Baughman testified that appellant made inconsistent efforts toward "get[ting] her life together," sometimes working "really, really" hard and sometimes not. According to Baughman, while at Miriam House appellant was mainly concerned with getting her social security check, more so even than using the resources available at Miriam House to help appellant regain custody of her children. Baughman also testified that she had the sense that appellant lied to her, but she never actually caught appellant in a lie. Appellant left Miriam House abruptly and without notice, and she never returned.
 {¶ 14} On cross-examination Baughman testified that appellant was good at arranging for her own transportation and volunteering a couple of times a week at the Community Action Commission. She also completed parenting classes. Based on appellant's ability to do volunteer work, Baughman could see no reason why appellant could not go out and seek a paying job in the community. Baughman was also in a position to observe appellant when appellant's children came for a visit, and Baughman thought that appellant was very glad to have her children visit and that she was attentive to them and their needs. However, she also testified that despite appellant's ability to arrange transportation for her volunteer work, she often had trouble arranging for transportation for visits with her children. Baughman testified that she knew that appellant wanted her children to come live with her at Miriam House, and appellant was frustrated that this was not happening. Appellant seemed particularly upset after a hearing in which she did not regain custody, and she left Miriam House shortly after. Baughman testified on redirect examination that the police came to Miriam House twice during appellant's stay to serve warrants on her, taking her to jail the second time.
 {¶ 15} According to Baughman, after appellant left Miriam House, appellant began making harassing phone calls to Miriam House. Baughman filed a complaint with the city of Norwalk, and appellant told Baughman that she (appellant) pleaded no contest to those charges.
 {¶ 16} David S., Ashley's father, also testified. David testified that he and appellant had married but they were currently "legally separated." David stated that he separated from appellant because they often argued and because she often lied to him. Their arguments over finances, he testified, were often over money she owed to the courts for fines. David also testified that he and appellant lived together on and off during their relationship, and in the last three months that he and appellant lived together, they lived for a time with David's sister and then lived out of a van in a friend's driveway. David then moved in with his mother and stepfather without appellant. Since he has moved, he testified that appellant has made numerous phone calls to him of such a nature that he contacted the police and made a complaint for phone harassment. He also testified that appellant twice called the police and made false claims that David was trying to commit suicide. Finally, David testified that he thought it was in Ashley's best interest that the agency have permanent custody of her.
 {¶ 17} On cross-examination, David also testified to several incidents in which appellant had parked outside of his house for approximately twenty minutes at a time and just sat there. He also testified that he was aware that appellant received social security benefits that she did not use to pay child support. In terms of his opinions about Ashley's best interest, he testified that, while he has had negative experiences with appellant, these negative feelings did not influence him in deciding that Ashley's best interest would be served if the agency gained permanent custody of her.
 {¶ 18} Next, Deputy Paul Sigsworth of the Erie County Sheriff's Department testified. At the time of the hearing, according to Sigsworth, appellant had a felony charge pending against her for making a false report to police that David was trying to commit suicide.
 {¶ 19} Detective James Fulton of the Norwalk Police Department also testified about appellant's legal problems. He testified that appellant was convicted of writing letters to the agency under the name of Beth Fogelman, a woman with whom David was having a relationship with at the time of the hearing. The letters to the agency under the name Beth Fogelman "confessed" to lying in reports made to the agency; the letters also alleged illicit sexual affairs. During the course of investigating these letters, appellant admitted to Fulton that she, along with a friend, had actually authored those letters. He also testified that he investigated appellant in regard to some tire-slashing incidents, but he was never able to prove that she did these things.
 {¶ 20} Fulton also testified about an incident when he arrested appellant at her home. Appellant would not open the door for the officers and the officers needed to break a window to gain entry into the home and serve the warrant. According to Fulton, appellant's children were in the home at the time to witness these events, and the police had to find someone to watch the children after their mother's arrest. On cross-examination, Fulton testified that in the past couple of years his department had investigated phone harassment charges against appellant.
 {¶ 21} Corporal Kimberly Howell of the Huron County Sheriff's Department testified about the times that appellant was incarcerated at the Huron County Jail. According to Howell, appellant had been incarcerated 12 times since March 8, 1999, the last time being from December 13, 2001 to December 20, 2001. These incarcerations were for various charges including making a false report of child abuse, aggravated menacing, child endangerment, resisting arrest, obstructing justice, obstructing official business, violating probation, telephone harassment, financial responsibility suspension, and contempt.
 {¶ 22} Finally, Jerry Waters, the guardian ad litem, testified. Waters indicated that he had been assigned to this case in approximately May 2000, and since that time appellant had lived in approximately 14 different locations. He testified that she has not held a job since at least 1999. Waters also stated that a part of his responsibilities is to monitor appellant's compliance with the case plan. Waters testified that counselors indicated to him that appellant was either not doing well or making no progress in her counseling sessions. He concluded his testimony on direct examination by stating his opinion that Ashley's best interests would be served if the agency were granted permanent custody of her.
 {¶ 23} On cross-examination Waters testified about various attempts to conduct home studies in appellant's various homes. Waters testified that he always accompanied the social workers who were attempting to conduct the home studies. The most recent home study had been attempted the month before the permanent custody hearing. According to Waters, appellant was basically uncooperative with the social worker, refusing to answer questions either because they were "not relevant" or because she simply did not want to discuss certain topics. Waters held the opinion that appellant was uncooperative with the home study even despite knowing that it would be a significant factor in the agency's attempt to reunify her with her children.
 {¶ 24} Waters testified that he accompanied social workers on two other attempted home studies in the month before the hearing. One could not be completed because appellant was in jail. In another, appellant was again uncooperative, repeatedly telling Waters that he "knows where the door's at." In terms of appellant's various residences, Waters testified that appellant was not always cooperative in telling him where she was living, one time providing him with only an e-mail address.
 {¶ 25} As to appellant's compliance with the case plan — counseling, parenting classes, maintaining a residence, getting a job, and telling the truth — Waters characterized appellant's compliance as "poor" and her cooperation with him as "poor." He also characterized appellant's progress over the past two years as "[l]ittle, if none * * *."
 {¶ 26} Waters then testified to Ashley's situation in her current foster home, where she had been in the year or so preceding the hearing. According to Waters, the home is "more than sufficient" to raise a child, and Ashley is doing very well developmentally in her current placement. Ashley also has quite an emotional bond with her foster parents, who wish to adopt Ashley. Finally, Waters expressed his opinion that reunifying appellant and Ashley is not a realistic possibility.
 {¶ 27} On cross-examination, Waters testified about the condition of appellant's current apartment. Waters found the home inadequate for a child's needs. He testified that the home had no dining room table or chairs and that the place where appellant intended for her children to sleep was a mattress on the floor. The home is a one-bedroom apartment. Waters did admit that appellant kept food in the refrigerator. Finally, Waters testified that he believes appellant loves her children but that she had not made an honest effort to comply with the case plan.
 {¶ 28} Following the hearing, the magistrate granted permanent custody to the agency, finding that Ashley cannot be placed with either parent within a reasonable time and that Ashley had been in the custody of the agency for 12 or more months of a consecutive 22 month period. The magistrate also found that, upon considering the statutory factors, it was in Ashley's best interests to grant the agency permanent custody. The trial court judge adopted the magistrate's decision, and this appeal followed.
 {¶ 29} Appellant raises the following three assignments of error for our review:
 {¶ 30} "First Assignment of Error
 {¶ 31} "The trial court erred in admitting evidence during the adjudication which was dispositional in nature; specifically, voluminous hearsay, double hearsay; direct opinions as to the `best interest' of the child; [and] direct opinions to specific long-term placement for the child[.]
 {¶ 32} "Second Assignment of Error
 {¶ 33} "`The trial court's decision was not supported by the manifest weight of the evidence, which failed to meet the required clear and convincing standard of proof.', [sic] where the testimony elicited showed clearly that mother/appellant had complied with a significant part of the plan's goals and objectives; was continuing her effort to comply with the case plan; and where no substantive evidence or testimony was presented to show that she could not complete the case plan requirements within a reasonable time.
 {¶ 34} "Third Assignment of Error
 {¶ 35} "The actions of the Huron County JAFS in the course of the dependency proceedings was improper in that 1) the two siblings of appellant were separated and placed in different homes in different communities early in the case, which action exacerbated appellant's ability to visit the children, and otherwise work effectively toward reunification."
 {¶ 36} In her first assignment of error, appellant contends that the trial court erred in admitting evidence that was dispositional in nature in the adjudicatory phase of the hearing. Specifically, appellant challenges hearsay testimony and opinion testimony about Ashley's best interest. In evaluating this assignment of error, three issues are extant: (1) whether the March 2002 hearing was adjudicatory or dispositional; (2) whether the Rules of Evidence applied to the hearing; and (3) whether the trial court admitted inadmissible evidence.
 {¶ 37} The first issue is whether the hearing on the motion for permanent custody was adjudicatory or dispositional. Juv.R. 34(I) provides:
 {¶ 38} "Hearings to determine whether temporary orders regarding custody should be modified to orders for permanent custody shall be considered dispositional hearings and need not be bifurcated. The Rules of Evidence shall apply in hearings on motions for permanent custody."
 {¶ 39} Despite this clear language, appellant relies on Juv.R. 2(B) to support his contention that a motion for permanent custody is adjudicatory in nature. Before 1998, Juv.R. 2(B) included in the definition of "adjudicatory hearing" hearings to determine whether "temporary legal custody should be converted to permanent custody." However, this provision conflicted with the 1994 amendments to Juv.R. 34(I), which provided that such hearings are to be considered dispositional. Therefore, Juv.R. 2(B) was amended in 1998 to remove language including permanent custody hearings in the definition of adjudicatory hearings. Staff Notes, 1998, Juv.R. 2. Juv.R. 2(B) now provides:
 {¶ 40} "(B)'Adjudicatory hearing' means a hearing to determine whether a child is a juvenile traffic offender, delinquent, unruly, abused neglected, or dependent or otherwise within the jurisdiction of the court." We therefore conclude that the March 2002 hearing was dispositional.[4]
 {¶ 41} The next issue in connection with the first assignment of error is whether the Rules of Evidence apply in hearings on motions for permanent custody. Juv.R. 34(I) clearly indicates that they do. However, that rule is in conflict with R.C. 2151.35(B)(2)(b), which governs dispositional hearings. That section provides, in pertinent part:
 {¶ 42} "(2) The dispositional hearing shall be conducted in accordance with all of the following:
 {¶ 43} "* * *.
 {¶ 44} "(b) The court may admit any evidence that is material and relevant, including, but not limited to, hearsay, opinion and documentary evidence."
 {¶ 45} At least two courts have noted this conflict and have held that, pursuant to the Ohio Constitution, the juvenile rules control. See, e.g., In Re Brofford (1992), 83 Ohio App.3d 869, 873. BecauseBrofford was decided before the 1994 amendments to Juv.R. 34(I), it is somewhat outdated in holding that hearings on permanent custody motions are adjudicatory. Nevertheless, Brofford is still instructive for its reasoning that, pursuant to the Ohio Constitution, court rules on procedural matters control over conflicting statutes on procedural matters. See id. See, also, Section 5(B), Article IV, Ohio Constitution; In Re: Swisher (Apr. 23, 1997), Summit App. No. 17952. This court has held on a number of occasions that the Rules of Evidence apply at hearings on motions for permanent custody, see, e.g., In theMatter of: Donald W., Tina M., Heather R., JoAnne F., and James F. (Nov. 6, 1998), Lucas App. No. L-98-1054; In the Matter of: Cody T., Logan T.
(Nov. 7, 1997), Lucas App. No. L-96-194; In the Matter of: Davon B.,Dre-Vontae B., Dedra B. (May 9, 1997), Lucas App. No. L-96-187; In theMatter of: Antonio M., Tamerina M. (Aug. 15, 1997), Lucas App. No. L-96-188, and other courts have so held as well, see, e.g., In the Matterof Felicia Washington (2001), 143 Ohio App.3d 576, 581-582; In Re:Jonathan Reeves, Jason Reeves, Kalli Reeves, Terry Carmichael (June 7, 2000), Summit App. Nos. 19650, 19669, 19673, 19674, 19705, 19706, 19707. We therefore hold that the Rules of Evidence apply at hearings on motions for permanent custody.
 {¶ 46} The next issue is whether the trial court admitted evidence in contravention of the Rules of Evidence. Appellant contends, first, that the trial court admitted inadmissible hearsay testimony. However, appellant in her brief cites no specific examples of hearsay, making it impossible for us to review this portion of the first assignment of error. See App.R. 16(A)(7). We have previously held that it is appropriate to disregard assignments of error when the argument for that assignment of error does not comply with App.R. 16. See Love v. Pope
(July 14, 2000), Lucas App. No. L-99-1349; App.R. 12(A)(2). We therefore disregard appellant's argument that the trial court admitted inadmissible hearsay.
 {¶ 47} Appellant also contends that the trial court improperly admitted opinion testimony as to Ashley's best interest; according to appellant, such testimony was improper in an adjudicatory proceeding. First, we have already held that the hearing in question was dispositional. Second, according to Evid.R. 701, opinion testimony by lay witnesses is admissible if the opinions are: "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."
 {¶ 48} In a case such as this, where the issue is whether the child's best interest is served by granting permanent custody to the agency, the opinion of the social workers and the child's guardian ad litem fit the requirements of Evid.R. 701. We are not convinced that David's testimony fits the requirements of Evid.R. 701, but we find that any error in admitting his testimony was harmless as there was more than sufficient evidence absent David's testimony to support the trial court's findings. Appellant's first assignment of error is found not well-taken.
 {¶ 49} In her second assignment of error, appellant contends that the judgment is against the manifest weight of the evidence. R.C.2151.353(A)(4) provides:
 {¶ 50} "(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:
 {¶ 51} "* * *.
 {¶ 52} "(4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child. * * *."
 {¶ 53} R.C. 2151.414(D) provides:
 {¶ 54} "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415
of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 55} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 56} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 57} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 58} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 59} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 60} "* * *."[5]
 {¶ 61} As pertinent to this case, R.C. 2151.414(E) provides:
 {¶ 62} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with eitherparent:
 {¶ 63} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 64} "* * *.
 {¶ 65} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 66} "* * *.
 {¶ 67} "(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
 {¶ 68} "* * *.
 {¶ 69} "(16) Any other factor the court considers relevant.
 {¶ 70} "* * *."
 {¶ 71} The trial court found that: "1) Ashley cannot be placed with either parent within a reasonable amount of time; 2) Ashley has been in the custody of Huron County Department of Jobs and Family Services over twelve (12) months of a consecutive twenty-two (22) month period; and 3) after reviewing the factors set forth in Ohio Revised Code Section2151.353, it is in Ashley's best interest to be placed permanently with the Department of Job and Family Services."
 {¶ 72} The Supreme Court of Ohio has held that clear and convincing evidence is:
 {¶ 73} "* * * that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 74} Upon review of the evidence presented at the hearing on the motion for permanent custody, we find that the evidence clearly and convincingly established that an award of permanent custody to the agency was proper. Most significantly, appellant's on-going criminal legal problems (some involving dishonesty), her failure to provide stable housing, and her failure to financially support her children leads us to the conclusion that appellee has established by clear and convincing evidence that the agency should be awarded permanent custody of Ashley. Appellant's second assignment of error is not well-taken.
 {¶ 75} In her third assignment of error, appellant contends that the agency hindered her ability to comply with the case plan by separating her two children. We find nothing in the record to substantiate this claim. The fact that the children had different fathers and, consequently, different relatives, and the fact that a relative placement was an option for James and not for Ashley, cannot be held against the agency. We therefore find appellant's third assignment of error not well-taken.
 {¶ 76} Upon consideration, we find that substantial justice was done the party complaining, and the judgment of the Huron County Juvenile Court is affirmed. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
Melvin L. Resnick, J., James R. Sherck, J. and Mark L. Pietrykowski,P.J. CONCUR.
[1] David voluntarily relinquished his parental rights to Ashley at the hearing on the motion for permanent custody, so he is not a party to this case.
[2] This case addresses Ashley only; James has been placed with relatives.
[3] Temporary custody of Ashley was granted to the Thomas family in late 2000. The Thomases then surrendered their temporary custody of Ashley, and Ashley was returned to foster care.
[4] R.C. 2151.414, which sets out the procedures for motions for permanent custody, provides additional support for our conclusion that the type of hearing at issue in this case is dispositional. R.C.2151.414(A)(1) provides, in pertinent part:
 "The court shall conduct a hearing in accordance with section 2151.35 of the Revised Code to determine if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion. The adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under section 2151.353 of the Revised Code pursuant to the adjudication shall not be readjudicated at the hearing and shall not be affected by the denial of permanent custody."
[5] R.C. 2151.414(E)(7) provides a list of crimes that may be considered by the court if committed by the parent or parents. Appellee has not alleged that appellant committed any of these crimes. Similarly, appellee has not alleged that any of the circumstances in R.C. 2151.414(E)(8) — (11) apply.